IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

NATIONWIDE MUTUAL FIRE : 
INSURANCE COMPANY, : 
 : 
    Plaintiff, : 
 :    CIVIL ACTION
v. :    NO. 2:08-CV-254-WCO
 : 
DILLARD HOUSE, INC., d/b/a "The : 
Dillard House"; JOHN P. DILLARD; : 
and MADELINE HECHT, : 
individually and as the personal : 
representative of the Estate of : 
STUART HECHT, deceased, : 
 : 
    Defendants. : 

## ORDER

The captioned case is before the court for consideration of plaintiff's

motion for summary judgment [23-1], defendant Madeline Hecht's cross motion

for summary judgment [42-1], and defendants Dillard House, Inc. and John P.

Dillard's ("Dillard Defendants") cross motion for summary judgment [47-1].

## I.    Introduction

This insurance coverage dispute arises out of the death of defendant

Hecht's husband, Stuart Hecht, on August 8, 2008.  Stuart Hecht died after he and

defendant Hecht vacationed at the Dillard House, a hotel and restaurant complex

owned and operated by the Dillard Defendants. Shortly thereafter, defendant Hecht, a Florida citizen, brought a diversity suit in this court against the Dillard Defendants, Georgia citizens, alleging nine counts of liability under Georgia law.[1] That case, identified as case number 2:08-cv-186-WCO, is still be pending on the court's docket. On December 19, 2008, plaintiff filed this declaratory judgment action, seeking a ruling as to whether plaintiff may avoid liability to defend and indemnify the Dillard defendants under two insurance policies—a commercial general coverage policy ("CGL Policy") and an umbrella policy ("Umbrella Policy").[2] Hecht and the Dillard Defendants have cross-moved for summary judgment. The court held a hearing on the parties' summary judgment motions on June 25, 2009.

## II.    Factual Background

The factual background of this case is straightforward and undisputed. In her amended complaint in the underlying case ("Amended Complaint"), Hecht alleges that her husband died of legionnaire's disease, which he allegedly

---

[1] The nine counts are: (1) negligence-failure to warn; (2) negligence-unsafe premises; (3) negligence-negligent procedure; (4) gross negligence; (5) wrongful death; (6) survival action; (7) loss of consortium; (8) punitive damages; and (9) demand for attorneys' fees and costs.

[2] In its petition for a declaratory judgment, plaintiff admits that the Dillard Defendants are the insured under the two relevant policies.

contracted by bathing in a hot tub in "Eddie's Cottage," a standalone structure at the Dillard House. The policies provide coverage for, *inter alia*, liability stemming from "bodily injury"[3] that "is caused by an 'occurrence' that takes place in the 'coverage territory.'" (CGL Policy, Ex. B to Pl.'s Compl. § I.1(b)(1)); *see also* Umbrella Policy Insurance Agreements, Ex. C to Pl.'s Compl. § B.1). An occurrence is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (CGL Policy, Ex. B to Pl.'s Compl. § V.13; Umbrella Policy Definitions, Ex. C to Pl.'s Compl. § C.12(a)).

Both the CGL Policy and the Umbrella Policy include an exclusion ("Bacteria Exclusion") that is at the heart of this case. In relevant part, the Bacteria Exclusion in the CGL Policy reads:

> This insurance does not apply to:
>
> **Fungi Or Bacteria**
>
> a.  "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed

_____

[3] "'Bodily injury' means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." (CGL Policy, Ex. B to Pl.'s Compl. § V.3).

concurrently or in any sequence to such injury or damage.

(Fungi or Bacteria Exclusion, CGL Policy, Ex. B to Pl.'s Compl.).[4] The equivalent exclusion in the Umbrella Policy is virtually identical, excluding:

> Any liability which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

(Fungi or Bacteria Exclusion, Umbrella Policy, Ex. C to Pl.'s Compl.).

In both policies, the Bacteria Exclusion is limited by an exception included in nearly identical form in both policies ("Consumption Exception"), which provides that the Bacteria Exclusion does not "apply to any 'fungi' or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption."[5] (Fungi or Bacteria Exclusion, CGL Policy, Ex. B to Pl.'s Compl).

---

[4] The policies do not define bacteria. The CGL Policy defines "fungi" as "any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents, or byproducts produced or released by fungi." (Fungi or Bacteria Exclusion, CGL Policy, Ex. B to Pl.'s Compl. ¶ 2). The Umbrella Policy defines "fungi" the same way, except that the word "fungi" at the end of the definition is replaced by the word "fungus." (Fungi or Bacteria Exclusion, Umbrella Policy, Ex. C to Pl.'s Compl. ¶ 3).

[5] The Umbrella Policy does not modify the word "consumption" with the word "bodily," thereby providing that the Bacteria Exclusion "does not apply to any 'fungi' or bacteria that are, are on, or are contained in, a good or product intended for consumption." (Fungi or Bacteria Exclusion, Umbrella Policy, Ex. C to Pl.'s Compl.).

Hecht's Amended Complaint alleges, *inter alia*, that Stuart Hecht bathed in a

> spa tub, the water for which was intended for the use and consumption of [hotel] guests . . . and [which] was distributed through the inn's potable water and plumbing system. The plumbing and spa tub environment was of such type and character as to create a reasonable foreseeable risk of the growth, promotion, cultivation and presence of legionella bacteria in the spa tub water.

(Hecht's Compl. ¶ 16). Additionally, the amended complaint alleges that

> the water in the spa tub in which STUART HECHT was immersed was used and consumed by him, and the quality of the water was deteriorated by his use and consumption; the water was, at the time, heated, and was subject to rapid circulation via the spa tubs [sic] whirlpool jets, thereby causing the water in the spa tub to steam, vaporize and otherwise become aerosolized, allowing it to be inhaled and ingested by Stuart Hecht.

(*Id.*). The amended complaint claims that the Dillard Defendants

> knew or should have known of the dangerous conditions that could arise from their negligence, recklessness and/or wanton misconduct in failing to take adequate steps to ensure that dangerously unsanitary conditions were not present . . . in the spa tub in Eddie's Cottage, and in the water in the spa tub in Eddie's Cottage.

(*Id.*).

To date, plaintiff has provided the Dillard Defendants with a defense subject to a reservation of rights notice.

### III. Discussion

#### A. *Legal Standard*

Summary judgment will be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  Only those claims for which there is no need for a factual determination and for which there is a clear legal basis are properly disposed of through summary judgment.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A court considering a motion for summary judgment must view the evidence in a light most favorable to the nonmoving party.  *See Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988).  It is important to recognize, however, that this principle does not require the parties to concur on every factual point.  Rule 56 "[b]y its very terms . . . provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

Consideration of a summary judgment motion does not lessen the burden on the nonmoving party.  The nonmoving party still bears the burden of coming

forth with sufficient evidence. *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990). However, it is important to note the difference "between direct evidence and inferences that may permissibly be drawn from that evidence. Where a nonmovant presents direct evidence that creates a genuine issue of material fact, the only issue is one of credibility; thus, there is no legal issue for the court to decide." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996). On the other hand, "[a] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the nonmovant relies, are 'implausible.'" *Id.* at 743. Adopting language from one of its sister circuits, the Eleventh Circuit explained:

> If the nonmoving party produces direct evidence of a material fact, the court may not assess the credibility of this evidence nor weigh against it any conflicting evidence presented by the moving party. The nonmoving party's evidence must be taken as true. Inferences from the nonmoving party's "specific facts" as to other material facts, however, may be drawn only if they are reasonable in view of other undisputed background or contextual facts and only if such inferences are otherwise permissible under the governing substantive law. This inquiry ensures that a "genuine" issue of material fact exists for the factfinder to resolve at trial.

*Id.* (citation omitted). "Where the evidence is circumstantial, a court may grant summary judgment when it concludes that no reasonable jury may infer from the assumed facts the conclusion upon which the nonmovant's claim rests." *Id.*

    B.    *Analysis*

        1.    *Issues Presented*

As an initial matter, the court notes that "an insurer's duty to pay and its duty to defend are separate and independent obligations." *Penn-America Ins. Co. v. Disabled Am. Veterans, Inc.*, 490 S.E.2d 374, 376 (Ga. 1997) (quotation marks and citation omitted).[6] Thus, "[a]lthough an insurer need not indemnify an insured for a liability the insured incurs outside the terms of the insurance contract, an insurer must provide a defense against any complaint that, if successful, might potentially or arguably fall within the policy's coverage." *Elan Pharmaceutical Research Corp. v. Employers Ins. of Wausau*, 144 F.3d 1372, 1375 (11th Cir. 1998) (applying Georgia law). Of course, an insurer is not required to defend against allegations that are expressly excluded under the policy. *See, e.g.*, *Bituminous Cas. Corp. v. N. Ins. Co. of N.Y.*, 548 S.E.2d 495, 498 (Ga. Ct. App. 2001).

---

[6] The parties have assumed that Georgia law governs the interpretation of the insurance policies at issue, and the court finds no error in that assumption. The court notes, however, that federal law governs the discretionary question of prematurity. *See Edwards v. Sharkey*, 747 F.2d 684, 686 (11th Cir. 1984).

Although the parties have largely failed to distinguish between plaintiff's potential obligations to defend and indemnify, the court must determine whether both questions are appropriate for review at this time or whether they are premature. *See Am. Fid. & Cas. Co. v. Penn. Threshermen & Farmers' Mut. Cas. Ins. Co.*, 280 F.2d 453, 461 (5th Cir. 1960).[7] In *American Fidelity*, the former Fifth Circuit considered the merits of a declaratory judgment petition asking whether an insurance company had a duty to defend under an insurance policy. *See id* at 455-60. The court determined, however, that the question of whether the same insurance company had a duty to indemnify was not yet mature. *Id.* at 461 (explaining that "[u]nlike the demand to take over the defense, . . . this request [for a ruling on the duty to indemnify] sought a declaration on a matter which might never arise.").[8] After discussing the various issues that might affect the question of indemnification—chiefly among them the question of whether the insurance company's defense would succeed, thus defeating liability in the first

---

[7] Decisions of the Fifth Circuit handed down prior to close of business on September 30, 1981, are binding on this court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc)).

[8] *American Fidelity* was not a ripeness case under the Article III case or controversy requirement or related prudential doctrines, but rather addressed the discretion afforded federal courts under the Declaratory Judgment Act to decline to resolve premature questions. *See Sharkey*, 747 F.2d at 686 (11th Cir. 1984) (noting that *American Fidelity* was "predicated on the traditional discretion of federal courts exercising jurisdiction over declaratory judgment actions").

place—the court flatly proclaimed that "it is not the function of a United States District Court to sit in judgment on these nice and intriguing questions which today may readily be imagined, but may never in fact come to pass."[9] *Id.*; *see also Allstate Ins. Co. v. Employers Liab. Assurance Corp.*, 445 F.2d 1278, 1281 (5th Cir. 1971) ("[N]o action for declaratory relief will lie to establish an insurer's liability until a judgment has been rendered against the insured since, until judgment comes into being, the liabilities are contingent and may never materialize."); *Canal Ins. Co. v. Cook*, 564 F. Supp. 2d 1322, 1325 (M.D. Ala. 2008) ("No court has determined . . . whether Bear Creek and McGriff are liable for Cook's injuries; therefore, any determination as to indemnification is premature."); *Smithers Constr., Inc. v. Bituminous Cas. Corp.*, 563 F. Supp. 2d 1345, 1349 (S.D. Fla. 2008) ("[A]n insurer's duty to indemnify is not ripe for adjudication in a declaratory judgment action until the insured is in fact held liable

---

[9] In a 2007 case, the Georgia Court of Appeals found no error in a trial court's determination of the duty to indemnify before judgment had been entered fixing liability on the insured. *See ALEA London Ltd. v. Woodcock*, 649 S.E.2d 740, 747 (Ga. Ct. App. 2007). The court approved the early determination of the indemnification question because "it was not until after discovery was completed, and shortly before trial," that the issue arose. *Id.* The court explained that "[u]nder these circumstances," a declaration on the duty to defend was appropriate. *Id. Woodcock*, however, is inapposite for two reasons. First, the question of whether a declaratory judgment petition is premature is one of federal law, not state law. Second, the particular circumstances that led the *Woodcock* court to reach its decision are not present here. Here, rather than having completed discovery, the parties have barely begun; indeed, Hecht has filed a motion seeking relief for what she claims was the Dillard Defendants' spoliation of evidence.

in the underlying suit.") (citations omitted); *Employers Mut. Cas. Co. v. All Seasons Window & Door Mfg., Inc.*, 387 F. Supp. 2d 1205, 1211-12 (S.D. Ala. 2005) ("It is simply inappropriate to exercise jurisdiction over an action seeking a declaration of the plaintiff's indemnity obligations absent a determination of the insureds' liability."); *Northland Cas. Co. v. HBE Corp.*, 160 F. Supp. 2d 1348, 1360 (M.D. Fla. 2001) ("Because an insurer's duty to indemnify is dependent on the outcome of the case, any declaration as to the duty to indemnify is premature unless there has been a resolution of the underlying claim."); *Sphere Drake Ins., P.L.C. v. Shoney's, Inc.*, 923 F. Supp. 1481, 1493 (M.D. Ala. 1996) ("Because the duty to indemnify will arise only after the underlying cases are resolved, this contention is premature."); *Great N. Paper Co. v. Babcock & Wilcox Co.*, 46 F.R.D. 67, 70 (N.D. Ga. 1968) ("The court should not pass on questions of insurance coverage and liability for indemnification when the contingencies giving rise to them may never occur.  To do so would amount to an advisory opinion.").

Here, "any number of eventualities" could change the analysis of whether plaintiff owes a duty to indemnify under the policies.  *All Seasons Window & Door*, 387 F. Supp. 2d at 1211.  Thus, the court will follow the "wealth of authority" counseling against exercising jurisdiction over the premature issue of

the duty to indemnify and will confine its discussion to the question of whether

plaintiff owes a duty to defend under the CGL and Umbrella Policies. *Id.* at 1212.

In considering this question, the court is mindful that

> [t]o excuse the duty to defend[,] the petition must
> unambiguously exclude coverage under the policy . . .,
> and thus, the duty to defend exists if the claim
> *potentially* comes within the policy. Where the claim is
> one of potential coverage, doubt as to liability and [the]
> insurer's duty to defend should be resolved in favor of
> the insured.

*Disabled Am. Veterans, Inc.*, 490 S.E.2d at 376 (alteration in original, emphasis

added) (quoting 7C APPLEMAN, INSURANCE LAW AND PRACTICE § 4684.01).

Finally, the court notes that "[u]nless otherwise defined in the contract, terms in

an insurance policy are given their ordinary and customary meaning." *W. Pac.*

*Mut. Ins. Co. v. Davies*, 601 S.E.2d 363, 367 (Ga. Ct. App. 2004) (quotation

marks and citation omitted).

Here, two basic issues frame the parties' debate: (1) whether the Amended

Complaint alleges facts that constitute an "occurrence" within the meaning of the

contracts of insurance; and (2) whether the Bacteria Exclusion precludes

coverage.

2. *Whether the Amended Complaint Alleges Facts that Constitute an "Occurrence"*

Under the contracts, an "occurrence" is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (CGL Policy § V.13; Umbrella Policy Definitions § C.12(a)). Plaintiff argues that "[b]ecause the underlying claims arise from the conscious, voluntary failure by the Dillard [D]efendants to maintain sanitary conditions at the Dillard House, their alleged actions do not constitute an occurrence within the meaning of the policies" and, accordingly, that "[n]o coverage exists under either the CGL or Umbrella Policy because the decedent's injury and death was not caused by an 'occurrence.'" (Pl.'s Consol. Resp. To Defs.' Mots. Summ. J. 2-3). Defendants insist that "accident"—the key word used to define "occurrence"—should be read broadly, limited only by conduct that is intentional. Defendants then argue that because the word "accident" is not defined in the policies, the policies are ambiguous, requiring the court to construe "occurrence" against plaintiff and, accordingly should find coverage. The court, however, finds it unnecessary to identify an ambiguity in determining that the allegations in the Amended Complaint allege conduct that falls within the policies' definition of "occurrence."

"An insurer's duty to defend is determined by comparing the allegations of the complaint with the provisions of the policy." *Nationwide Mut. Fire Ins. Co.*

*v. City of Rome*, 601 S.E.2d 810, 812 (Ga. Ct. App. 2004) (quotation marks and citation omitted). In arguing that the allegations in the Amended Complaint do not constitute an occurrence, plaintiff takes a position that, if adopted, would immunize plaintiff from liability in nearly every case where a plaintiff alleges that an insured acted negligently. If, as urged by plaintiff, the Amended Complaint is interpreted to allege that the Dillard Defendants acted consciously and voluntarily, nearly every complaint alleging negligence could be construed in such a way. If a grocery store customer slips on a banana peel, a standard negligence claim arising out of the fall could be seen as averring conscious and voluntary action—under plaintiff's interpretative approach, the grocery store must have *consciously and voluntarily* failed to adopt a practice of frequently monitoring its floors, or a grocery store employee might have *consciously and voluntarily* overlooked the peel during a routine sweep of the aisle. Here, viewing the Amended Complaint as alleging conscious and voluntary acts—and therefore not constituting an "occurrence"—is no more of a stretch than taking a garden-variety banana peel slip-and-fall case to allege conscious and voluntary acts. Moreover, the causes of action alleged in the Amended Complaint are, on their face, common

law negligence claims.[10]   Simply, and contrary to plaintiff's insistence, the allegations in the Amended Complaint do not describe a "conscious, voluntary failure by the Dillard [D]efendants to maintain sanitary conditions."  Rather, the Amended Complaint alleges facts that constitute an "occurrence"—"an accident, including continuous or repeated exposure to substantially the same general harmful conditions."   (CGL Policy § V.13; Umbrella Policy Definitions § C.12(a)).  Plaintiff's duty to defend turns on the allegations in the Amended Complaint, and the court finds that those allegations constitute an "occurrence" within the meaning of the policies; plaintiff's "occurrence" argument fails.

3.   *Whether the Amended Complaint Alleges Facts that Fall Within the Bacteria Exclusion*

Plaintiff next argues that the court should declare plaintiff not liable to defend the underlying suit because legionella pneumophila is a bacterium and, accordingly, falls squarely within the Bacteria Exclusion.  For the most part, defendants do not contest that the general language of the Bacteria Exclusion applies to the allegations in the Amended Complaint.[11]  Rather, defendants argue

---

[10] The substantive claims in the Amended Complaint are (1) negligence-failure to warn; (2) negligence-unsafe premises; (3) negligence-negligent procedure; (4) gross negligence; (5) wrongful death.

[11] Defendants equivocate on this matter.  On the one hand, Hecht's motion for summary judgment concedes that the Bacteria Exclusion "unambiguously exempts the claims in the underlying case," (Def. Hecht's Mot. Summ. J. 14), and on the other hand, Hecht maintains that

that the Consumption Exception also applies, removing the allegations from the scope of the Bacteria Exclusion. The court must therefore determine whether bacteria in a hot tub "are, are on, or are contained in, a good or product intended for (bodily) consumption." There does not appear to be any dispute that bacteria in a hot tub are not, themselves, a good or product intended for any type of consumption. The question is, therefore, whether bacteria in a hot tub "are on, or are contained in, a good or product intended for (bodily) consumption." Because the complaint alleges that the source of the alleged legionella bacteria was the hot tub water, the court may narrow the focus of its inquiry even further, asking only whether water in a hotel hot tub is a good or product intended for (bodily) consumption.

---

the term "bacteria" is ambiguous. (*Id.* at 14 n.3). The court rejects the notion that the word "bacteria" is ambiguous, and as Hecht notes, Hecht "has submitted an expert affidavit attesting to the bacterial nature of legionella." (*Id.*). Likewise, the Dillard Defendants expressly "do not contest plaintiff's assertion that Legionnaire's disease is by definition, bacterial in origin and results from exposure to Legionella, a bacteria [sic]." (Dillard Defs.' Resp. 6). They do, however, "point out that because [plaintiff] failed to define the term 'bacteria' and also failed to specifically include any reference to Legionnaire's disease or Legionella pneumophila in either of the two Fungi or Bacteria Exclusions at issue that doubt can be said to exist concerning whether or not the two exclusions at issue were intended to deny coverage for claims arising from Legionnaire's disease." (*Id.*).

Defendants argue that the existence of multiple reasonable interpretations of "consumption" renders the provision ambiguous, and that the court should therefore apply defendants' urged definition.[12]  Plaintiff calls defendants'

---

[12]  The parties wage a minor battle over the question of whether water is a "good or product."  The court has no trouble concluding that water in a hotel hot tub is a good or product. *See Soleil Group*, 2:07-CV-3995 (finding water in a hot tub and swimming pool to be a good or product intended for consumption); *cf. Wiseman-Hughes Enters. v. Harleysville Lake States Ins. Co.*, No.07-C-0336, 2009 U.S. Dist. LEXIS 29797, at *13 (N.D. Ill. Apr. 8, 2009).  Among other definitions that are inapplicable to the context of the Consumption Exception, *Webster's Third New International Dictionary, Unabridged* defines "good" as

> **3 a**: a particular advantage or benefit : an object of desire or endeavor : something beneficial; specifically : *something that has economic utility* or satisfies an economic want

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED (2002) (emphasis added). "Product" is defined as

> **2 a**: something produced by physical labor or intellectual effort
> **2 b**: a result of the operation of involuntary causes or an ensuing set of conditions: consequence, manifestation

*Id.*  In the context of a hotel hot tub, water is a good because it undoubtedly "has economic utility"—few paying hotel guests would enjoy a water-less hot tub.  Because the Consumption Exception is phrased in the disjunctive ("good *or* product"), the court need not consider whether water falls within the definition of product.  The court notes, however, that the *Soleil Group* court examined the *Black's Law Dictionary* definition and concluded that water is a "product."  *See Soleil Group*, 2:07-CV-3995, at *9.

Although the court does not reach the question of whether water is a product, the court will briefly address one of plaintiff's arguments related to the *Soleil Group* analysis on the topic, especially in light of defendants' strong reliance on *Soleil Group*.  Plaintiff argues that the *Soleil Group* court's construction of the Consumption Exception renders the Bacteria Exclusion meaningless.  Plaintiff is on solid ground in asserting that courts avoid interpreting contract provisions in a way that leaves another provision meaningless or superfluous.  *See, e.g.*, *Schager Props. v. Tara State Bank*, 469 S.E.2d 743, 746 (Ga. Ct. App. 1996) ("[T]he favored construction will be that which gives meaning and effect to all the terms of the contract

ambiguity argument "tortured," arguing that water in a hot tub is not intended for consumption, bodily or not, and, accordingly, that the Consumption Exceptions are not ambiguous. (Pl.'s Consol. Resp. 8).

It is well settled that "[i]f an insurance contract is capable of being construed two ways, it will be construed against the insurance company and in favor of the insured." *Claussen v. Aetna Cas. & Sur. Co.*, 380 S.E.2d 686, 688 (Ga. 1989); *see also Cincinnati Ins. Co. v. Magnolia Estates, Inc.*, 648 S.E.2d

---

over that which nullifies and renders meaningless part of the document."). Plaintiff is on shakier ground, however, in arguing that the *Soleil* interpretation "essentially read[] the [Bacteria Exclusion] out of the policies." (Pl.'s Consolidated Resp. 10). Plaintiff argues:

> For example, consider a claim . . . arising out of exposure to mold contained in a hotel's walls. If such exposure causes bodily injury, under the *Soleil Group* [and defendants'] reasoning, the exception would render those claims covered as the mold would be present in the hotel's ambient air, which qualifies as a good or product intended for consumption. Just as water is treated and processed, so too is air, particularly when it is heated or cooled and transported through the hotel's HVAC system.

(Pl.'s Consolidated Resp. 10). Regardless of whether ambient air is intended for consumption, however, it is not a good or product. The *Soleil Group* court noted that the Bacteria Exclusion, which is standard in liability insurance policies, is intended to absolve insurance companies for liability related to mold in walls caused by defective construction. *Soleil Group*, 2:07-CV-3995, at *11. In a case where a plaintiff alleges injuries stemming from bacteria or mold in a wall having seeped into the ambient air—the very type of claim intended to be excluded in the first place—there is no doubt that the insurer will not be liable.

The very nature of an exception to an exclusion is such that the exclusion is weakened, and defendants' interpretation of the Consumption Exception undoubtedly limits the reach of the Bacteria Exclusion. Nonetheless, the court finds that the broad construction of the Consumption Exception adopted in *Soleil Group* and urged by defendants does not render the Bacteria Exclusion meaningless and, accordingly, plaintiff's argument to the contrary fails.

498, 500 (Ga. Ct. App. 2007) ("If a provision of an insurance policy is susceptible to more than one interpretation, [the court] construes such provision against the insurer."). This principle is "especially" true with respect to "exclusions from coverage sought to be invoked by the insurer." *Yeomans & Assocs. Agency, Inc. v. Bowen Tree Surgeons, Inc.*, 618 S.E.2d 673, 679 (Ga. Ct. App. 2005). Thus, although the court is less than confident that the Consumption Exception was intended to apply to water in a hot tub, the court must approach the policy language with an eye toward whether the relevant language is facially susceptible to multiple interpretations. *See Magnolia Estates, Inc.*, 648 S.E.2d at 500.

Defendants proffer multiple definitions of "consumption" in arguing that water in a hot tub is a "good or product intended for bodily consumption."[13] In doing so, defendants rely heavily on a recent unpublished district court opinion from the District of South Carolina in which the court examined a fungi and bacteria exclusion nearly identical to the one at issue here, including an exception

---

[13] In addition to offering alternative definitions of "consumption," the Dillard Defendants point out that "plaintiff failed to define bacteria, ingestion, inhalation, good, product, human [sic] consumption and/or consumption" in the policies. (Dillard Defs.' Reply 3). "As a consequence," the Dillard Defendants continue, "defendants believe that an ambiguity exists between the language contained in the [Bacteria Exclusions] and the language contained in the [Consumption Exceptions]." (*Id.*). The Dillard Defendants overreach in tying the failure to define various terms in a contract to the contract's ambiguity. Many contracts lack definitions for terms or phrases and, of course, are not necessarily ambiguous on that account. *Cf. Davies*, 601 S.E.2d at 367 (explaining that undefined terms are given their "ordinary and customary meaning"). Thus, the court expressly rejects defendants' argument that the failure to define certain terms, alone, creates an ambiguity.

based on goods or products intended for consumption. *See Union Ins. Co. v. Soleil Group*, No. 2:07-CV-3995 (D.S.C. May 13, 2009). Plaintiff challenges several aspects of the *Soleil Group* court's reasoning and urges the court to instead look to another recent unpublished district court decision, *AMCO Insurance Co. v. Swagat Group, LLC*, No. 07-3330, 2009 WL 331539 (C.D. Ill. Feb. 10, 2009). In *Swagat Group*, the district court for the Central District of Illinois relied on a fungi and bacteria exclusion equivalent to the one at issue in this case in holding that an insurance company did not have a duty to defend two underlying lawsuits arising out of harm caused by legionnaire's disease in a hotel hot tub and swimming pool. In *Swagat Group*, however, the court did not discuss whether the bacteria exclusion contained a consumption exception similar to the one at issue here and, accordingly, analysis of that case is necessarily incomplete as applied to this case.[14] Regardless, this court finds reliance on those decisions

---

[14] Plaintiff represents that the bacteria exception in *Swagat Group* did contain an identical consumption exception. In support of this contention, plaintiff has submitted insurance policies that plaintiff alleges are the policies at issue in *Swagat Group*. Despite quoting extensively from the relevant policies, however, the *Swagat Group* court did not include in its order any reference to a consumption exception. Even assuming, *arguendo*, that the *Swagat Group* policies did include a consumption exception, the lack of reference to or analysis of the exception in the court's order makes plaintiff's reliance on that case misplaced. This court will not read into *Swagat Group* something that is not there; that court's failure to even mention the consumption exception suggests that the parties did not brief the issue and that the court did not take the consumption exception into account in interpreting the policy.

unnecessary to conclude that "consumption" is susceptible to multiple reasonable interpretations.

*Webster's Third New International Dictionary, Unabridged*[15] defines "consumption" in multiple ways:

> **1 a**: the act or action of consuming or destroying
>
> **1 b**: the wasting, using up, or wearing away of something
>
> **2** : *the utilization of economic goods in the satisfaction of wants* or in the process of production resulting in immediate destruction (as in the eating of foods), gradual wear and deterioration (as in the habitation of dwellings), no change aside from natural decay (as in the enjoyment of art objects), or transformation into other goods (as in manufacturing)

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED (2002) (emphasis added). Plaintiff insists that in the context of the Consumption Exception, "consumption" has a meaning within the first dictionary definition: "the wasting, using up, or wearing away of something." Although the *Soleil Group* court found that water in a hot tub *is* "used up," this court finds it

---

[15] In identifying the "ordinary and customary meaning" of words in a contract, courts often turn to dictionaries "because they supply the plain, ordinary, and popular sense" of a word. *Davies*, 601 S.E.2d at 367 (referring to the *Webster's New World Dictionary* to define the word "failure" in an insurance policy).

unnecessary to frame the question in that way.[16] *See Soleil Group*, No. 2:07-CV-3995, at *9-10.  Rather, the second definition guides the court's analysis because it represents a reasonable alternative as applied to the allegations in the Amended Complaint: "the utilization of economic goods in the satisfaction of wants."  As discussed, water in a hot tub is a good—indeed, it may most specifically be considered an "economic good," since it gives economic utility to the hot tub and because water is a commodity for which hotels and other users pay.  Surely, a hotel guest who bathes in a hot tub does so as a mean of indulging, or "satisfying," a desire, or "want."  Given the second *Webster's* definition, the court

---

[16] Applying the "used up" definition of consumption to find that water is a good or product intended for consumption, the *Soleil Group* court explained that

> while water in either a swimming pool or whirlpool tub may not be noticeably "used up" every time a person makes use of one of these amenities, the [h]otel surely puts water in them for its guests' consumption.  Simply because the physical make-up and quantity of water in a swimming pool or whirlpool tub may not visibly deteriorate or decrease after every use, like bottled water, napkins, or soap, the court is unwilling to disregard the fact that, at the least, the *quality* of the water, undoubtedly the feature that hotel guests care more about, surely does.  In fact, the [h]otel must regularly treat the water in these amenities with chemicals because the [h]otel guests' use of these amenities deteriorates the quality of the water made available in them.  Morevoer, the [h]otel also probably drains the water in these amenities on occasion and refills them because of its guests' consumption.

*Soleil Group* No. 2:07-CV-3995, at *10.

finds that water in a hot tub falls squarely within a reasonable interpretation of the phrase "good . . . intended for consumption."

The court is left with a single question: whether water in a hot tub is a "good . . . intended for *bodily* consumption," as used in the CGL Policy. The court returns to *Webster's Third New International Dictionary, Unabridged*, which defines "bodily" as

> **1**: having a body or a material form : PHYSICAL, CORPOREAL
>
> **2 a**: of or *relating to the body*
>
> **2 b**: concerning the body

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED (2002) (emphasis added). Having already determined that the relevant good, water in a hot tub, is intended for consumption—because it is intended for the "utilization . . . in the satisfaction of wants"—the court need only decide whether the particular type of consumption intended is "relating to the body." Hot tubs are created for the purpose of bathing one's body, making it difficult to conceive of any modifier of "consumption" that would more aptly describe the type of

"utilization . . . in the satisfaction of wants" facilitated by a hot tub. The Consumption Exception in the CGL Policy therefore applies to the allegations in the Amended Complaint.

In sum, the court finds that a reasonable interpretation of the Consumption Exception supports Defendants' position that the allegations of the complaint in the underlying case fall within the scope of coverage under both the CGL Policy and the Umbrella Policy. The Consumption Exception allows for coverage under both policies for allegations of harm caused by "bacteria that are, are on, or are contained in, a good or product intended for (bodily) consumption." The Amended Complaint alleges that Stuart Hecht contracted legionnaire's disease by inhaling or otherwise ingesting legionella bacteria found in the water in which he was bathing in a hot tub at the Dillard House. Thus, the allegations fall within the exception, and coverage exists, if water is a "good or product intended for (bodily) consumption." Water in a hot tub is a "good" because it is "something that has economic utility"; it is intended for "consumption" because it is meant for the "utilization . . . in the satisfaction of wants"; and, specifically, it is intended for "bodily consumption" because it is specifically meant for the "utilization . . . in the satisfaction of wants . . . relating to the body." *Cf. United States v. Midway Heights County Water Dist.*, 695 F. Supp. 1072, 1076 (E.D. Cal. 1988)

(finding "human consumption" of water "to include such normal uses as bathing and showering").

## IV.    Conclusion

For the foregoing reasons, the court finds that the allegations in the Amended Complaint fall within the duty to defend of both the CGL Policy and the Umbrella Policy.  Because it is premature to determine whether the policies impose a duty to indemnify the Dillard Defendants for any liability that might arise out of the underlying case, this order does not express any opinion as to that issue.  The court will dismiss this case without prejudice on the issue of plaintiff's duty to indemnify.

Because plaintiff has a duty to defend under the policies, plaintiff's motion for summary judgment [23-1] is hereby **DENIED in part**, defendant Madeline Hecht's cross motion for summary judgment [42-1] is hereby **GRANTED in part**, and the Dillard Defendants' cross motion for summary judgment [47-1] is

hereby **GRANTED in part**.  The remainder of this case is hereby **DISMISSED without prejudice as premature**.

  **IT IS SO ORDERED**, this 28th day of August, 2009.


          s/*William C. O'Kelley*
          WILLIAM C. O'KELLEY
          Senior United States District Judge